

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00095-CV

IN THE INTEREST OF
J.P., MINOR CHILD

------------

FROM COUNTY COURT AT LAW NO. 1 OF WICHITA COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

In two issues, Appellant Father appeals the termination of his parental rights to J.P.  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Procedural Background

J.P. was removed from his mother S.M. in 2006. We affirmed the termination of S.M.'s parental rights to him but reversed the termination of Father's parental rights to J.P. after concluding that, as to Father, the evidence was factually insufficient to support the jury's best interest finding. *In re J.P.*, No. 02-10-00448-CV, 2012 WL 579481, at *1, *4 (Tex. App.—Fort Worth Feb. 23, 2012, no pet.) (mem. op. on reh'g). We remanded the portion of the case pertaining to Father for a new trial. *Id.* at *10. On February 26, 2013, the trial court held the new trial and terminated Father's parental rights to J.P. again. This appeal followed.

## III. Best Interest of the Child

In two issues, Father argues that the evidence is legally and factually insufficient to support the trial court's best interest finding.

### A. Standards of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92

(1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001 (West Supp. 2012), § 161.206(a) (West 2008). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and conservatorship). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008).

In evaluating the evidence for legal sufficiency to support the trial court's best interest finding, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that termination of Father's parental rights was in the child's best interest. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider

3

undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent-child relationship would be in the child's best interest. Tex. Fam. Code Ann. § 161.001(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## B. Evidence

The following individuals testified at the February 2013 trial: Child Protective Services (CPS) adoption specialist Tammy Durham, who was J.P.'s CPS caseworker from March 2007 to April 2008; Linda Johnson, J.P.'s CPS

4

caseworker from April 2008 through the time of the trial; and John Nunn, the plant manager of the company where Father had worked until November 12, 2012. J.P. testified via video deposition. Father failed to appear, although his attorney acknowledged that Father knew about the trial.

The trial court took judicial notice of the contents of its file upon DFPS's request and admitted into evidence J.P.'s mental health, medical, and school records. It also admitted Father's police records and his mental health care provider records, which included his July 21, 2008 substance abuse assessment and his August 2008 psychological evaluation.

## 1. J.P.

J.P., who was born on June 4, 1999, had been in the State's care for almost seven years—almost half of his life—by the time of the second trial. His mother S.M. was bipolar, and her history of incarceration had led to the neglect and abandonment of J.P. and her other five children. As J.P. was the oldest, S.M. left him in charge of his siblings. S.M. and Father never married, and Father had two older sons by another woman. J.P. reported during a psychiatric evaluation that both S.M. and Father had abused drugs in the past and that S.M. had been involved with men who physically mistreated her.

Depression had been a longstanding problem for J.P., along with anger management.[2] He also suffered from dyslexia and attention deficit–hyperactivity disorder and had to have special education accommodations. J.P. repeated the first grade and had trouble making friends. The social history section of his March 10, 2011 psychological evaluation reflected that J.P. was a weak student who commonly presented behavior problems but who was an excellent athlete.[3]

S.M. frequently moved, and from 2002 to 2007, J.P. attended at least seven different schools. When J.P. was withdrawn from school in early 2008 because of another move, his attendance reflected that for the six-week period, he had been present for eighty-three days and absent for thirty-six, and that twenty-eight of the absences were unexcused. Durham testified that because S.M. had performed her CPS services, the children had to be returned to her on a monitored return. Durham agreed that this had been a "miserable failure," leading to the children's second removal.

The trial court admitted photographs of the house from which J.P. and the other children were ultimately removed from S.M. again. The photos were taken in March 2008. One of the photos showed feces on the bathroom walls. Other

---

[2]In 2007, J.P.'s emergency consent form signed by his mother reflected that J.P. suffered from depression and "psychotic features" and that he was taking Lexapro and Respiderol.

[3]In May 2006, J.P. received a D for the year in English and an F for the year in Reading. As of October 2007, J.P. continued to fail English and Reading but consistently had at least Bs in math, science, and social studies.

photos showed broken boards with nails poking out. The house did not have a refrigerator or running water. J.P. was around eight or nine years old when he lived there. Durham had no personal knowledge that Father had seen the house in that condition. However, Johnson testified that when the photos of S.M.'s house were introduced at the November 2010 trial, Father looked at them, said that he did not see anything wrong with J.P. living there, and said, "That's the way black people live." Durham said that when she would ask Father about having J.P. live with him, Father "would always tell [her] that he didn't want [J.P.] to come live with him, that he wanted [J.P.] to go live with [S.M.]" because Father could not take care of him.

Durham said that during the case, J.P. started experiencing significant emotional and mental issues and was hospitalized three times due to his out-of-control and difficult-to-manage behaviors. *See J.P.*, 2012 WL 579481, at *5. While J.P. was still living with S.M., he was hospitalized for a couple of days in a psychiatric hospital for hallucinations and depression. J.P. was referred to University Behavioral Health (UBH) in Denton by Bowie Memorial Hospital on November 5, 2009, because he had written a note saying, "I want to kill me,"[4] had threatened to cut off his foster sister's head, had hit other siblings in the

---

[4]Johnson testified that at some point before being placed in the residential treatment center, J.P. had become suicidal after a friend died in a car accident. We noted in our 2012 opinion that because of J.P.'s difficulties in dealing with the death of his friend, "a reasonable concern exists as to how J.P. would handle having Father removed from his life." 2012 WL 579481, at *6.

home, and had stabbed his hand with scissors. UBH changed J.P.'s medication from Lexapro to Prozac and introduced J.P. to new coping skills, anger management, and self-control techniques. UBH discharged him on November 18, 2009, noting significant improvement since his admission. UBH diagnosed J.P. with "major depressive disorder, recurrent, severe, without psychosis," and "oppositional defiant disorder." J.P. again went into inpatient care from June 29, 2010 to July 15, 2010, upon his removal from a foster home due to excessive defiance.[5]

J.P. was then moved from inpatient treatment to a residential treatment center[6] because, according to his medical records, he was "struggling with increased aggression and violent outbursts," and posed an "increased risk to [foster] family members," requiring a structured environment.[7] J.P. was placed in

---

[5]As we noted in our 2012 opinion, "J.P. had multiple 'meltdowns'; it was hard for him to cope with the regular stresses of life. J.P. experienced meltdowns at school that resulted in numerous calls to his foster parents and to CPS. J.P. was almost expelled from school because of his behavior." 2012 WL 579481, at *5.

[6]Johnson explained that a residential treatment center is a live-in residential program where children with serious mental or emotional problems receive intensive counseling.

[7]Johnson stated that J.P. had been placed in the residential treatment center because he had had serious "meltdowns" both at school and in his foster home that were causing him to become aggressive and violent with the little children in the home. By the time of the 2013 trial, J.P. still had no contact with his younger brother because at the time he was placed in the residential treatment center, J.P. had been screaming at him, spitting in his face, yanking him, pushing him, and throwing things at him. Johnson described J.P.'s meltdowns as "[he] would stop answering questions, stop talking, he would hide

8

residential treatment "due to his serious difficulty managing his emotions and behaviors on a daily basis," and one of his goals in treatment was "to stop beating up his brother." Johnson stated that although it was standard for a child to spend six months to a year in a residential treatment center, J.P. spent around eighteen months. J.P. had been in the residential treatment center for three or four months at the time of the first termination trial. *J.P.*, 2012 WL 579481, at *5.

During his course of treatment, J.P.'s behavior—which included aggressive outbursts, head-butting staff, hitting his head on the wall,[8] attempting to bite himself and others, using profanity with staff, and ripping up his clothing—led to him being placed in restraints from time to time and to being placed in seclusion.

In October 2010, J.P.'s therapist informed him that S.M. would be participating in a visit, and J.P. "expressed excitement and anticipation." However, after her visit, J.P.'s negative behavior increased. Around November 2010, S.M.'s parental rights were terminated by the trial court, and J.P. reported to a staff member and to his therapist that he was sad "because he wasn't going to be able to see his mom until he was eighteen." During this time, J.P.'s behavior worsened.

---

behind a couch or get under the table and refuse to come out and refuse to speak to anybody."

[8]J.P. told the residential treatment center staff, "I bang my head to get my anger."

In January 2011, J.P.'s therapist informed him that S.M. and Father would be coming for a supervised termination visit, because at the time, it appeared that both parents' rights had been terminated and they would no longer have contact with him until he turned eighteen. The post-visit notes indicate that J.P. was able to manage his emotions and behaviors both pre- and post-visit. But while J.P. "expressed appropriate levels of sadness related to termination contact with family," he later again had difficulty managing his emotions and behaviors.

In mid-March 2011, J.P. "expressed confusion related to the idea that he was not to have contact with family members until he turned 18," and the therapist tried to help him understand that his parents "were unable to provide an environment that was in his best interest and, as a result, they enlisted the help of the State to help raise" him. J.P.'s behavior again took a turn for the worse.

The doctor who performed J.P.'s March 10, 2011 psychological evaluation reflected that when J.P. "becomes overwhelmed by troubled thoughts or feelings[,] he may rapidly fall into emotional and behavioral decline" and that because J.P. had focused so heavily on his own unmet emotional needs throughout childhood, he "lacks the capacity to empathize with people or see points of view different than his." The doctor's recommendations for J.P. included the following:

1. [J.P.] is aware that he will eventually discharge from this facility to a less restrictive setting. He seems accepting of whatever happens next, but very much hopes he can succeed in a home setting since he wants to belong to someone. He will continue to

10

need strong behavioral supervision since he remains at risk for varied types and degrees of misconduct.

2. [J.P.] is currently provided psychiatric consultation and needs continued psychiatric treatment. It should be noted, however, that his behavior pattern stems from underlying identity problems and family failure as much as biological factors. Involvement in therapy that emphasizes improved impulse control and strengthening his identity is needed.

3. [J.P.] is a very weak student, particularly in reading and spelling, who needs educational remediation at school. Success in school can contribute to prosocial behaviors. Given his history of both academic and behavior problems, special education program should be considered.

In April 2011, J.P. accused his therapist of lying to him after the therapist explained that the visit with his parents had been a termination visit and reminded J.P. that he would not be able to speak with or see them again until he turned eighteen. J.P. replied that CPS had said he was having a termination session with S.M., and then several months later, he saw both S.M. and Father. His therapist interpreted that J.P.'s understanding of the termination "has been complicated due to the inconsistency with what was said and then what was done in terms of one additional visit for his mother." J.P.'s behavior, which included property destruction, disruptions, and suicidal ideation, required multiple and frequent redirections. J.P. expressed that he would act out until he was able to see his parents, and in June, July, August, and September 2011, J.P.'s therapist noted that his continued behavioral infractions, some of which included verbal aggression, program disruptions, and punching and kicking the walls, stemmed from his frustration and sadness about not seeing his parents until he

11

turned eighteen. However, by October 2011, J.P.'s behavior had improved, and he started expressing "pride and optimism about his treatment."

During his course of treatment with medication modifications—including Risperdal, Prozac, Intuniv, and Thorazine—J.P.'s anger steadily dissipated and he was able to interact appropriately with his peers and to identify alternative coping strategies to express his irritability and agitation without aggressiveness or bullying.

On January 2, 2012, the residential treatment center discharged J.P. into CPS caseworker Johnson's care for a foster home placement with Coach Tillman,[9] who coached basketball and volleyball at J.P.'s school. J.P.'s discharge diagnosis consisted of a not-otherwise-specified mood disorder and oppositional defiant disorder, treated with Abilify and Intuniv.

J.P. had another psychological evaluation in April and May 2012. In the evaluation, J.P. was diagnosed with moderate depression and was described as oversensitive and characterized by

> his apprehensiveness and fearfulness, his ambivalent desire for warmth and attachment, a marked depreciation of self-worth, and social oversensitivity, all combined with a need for emotional support, shyness, and hesitation with peers. Also evident is erratic and unpredictable behavior in family relationships. He wants closeness and affection, but he may self-protectively deny or restrain his desires. He is often anxious, feels friendless, experiences recurrent attentional difficulties, and frequently feels a pervasive disharmony of mood. Fearing abandonment, he may act out or

---

[9]We use pseudonyms for the names of any caregivers and family members, to protect the child's identity. *See* Tex. R. App. P. 9.8 & cmt.

12

become irritably resentful. Overconcerned with social rebuff, a worry that is often intensified by his erratic tendencies, he may elicit the rejection he fears, particularly from peers and family.

By the time of the second trial on February 26, 2013, J.P. was taking only one medication to treat his depression, he was still seeing a counselor, and he had been living with Tillman for a year.

J.P.'s video deposition was played to the trial court. J.P. was thirteen at the time of his video deposition. In his deposition, J.P. stated that he had "no clue" when asked how long it had been since he had last seen Father, but he agreed that it had been a long time and that he missed and loved Father. When Father's attorney asked J.P. whether he understood whether Father's rights to him could be terminated in the trial, J.P. answered, "Yes, sir," and J.P. agreed that he understood that this meant that he would not be able to see Father until he turned eighteen. When Father's attorney asked if that was something he wanted, J.P. said, "No sir." When Father's attorney asked him if he wanted to be able to see Father, J.P. said, "Yes, sir." And when Father's attorney asked him if he wanted to continue having visits with Father, even if Father could not take care of him because of Father's situation, J.P. said, "Yes, sir."

J.P. said that Math was his favorite subject and that he did well on his last report card, making As and Bs. J.P. agreed that before he lived with Tillman, his grades were not very good. He also agreed that Tillman helped him, that he loved her, and that she treated him well and made him do his homework. She also let him talk with her when he had a problem.

J.P. testified that he did chores to earn money, including taking out the trash and walking Bella the dog. J.P. stated that he liked living with Tillman and wanted to keep living there because "[he had] lots of friends there and people who care about [him] there," including Tillman. J.P. stated that he would like for Tillman to adopt him like she had adopted his sister Tamara and that he would take her last name.

J.P. said that when he still lived with S.M., no one made him do homework or clean his room; when DFPS's attorney asked him if it had seemed like anyone really cared about him back then, J.P. said, "No." He also said that before CPS became involved, he did not always feel safe. In contrast, Tillman did all of those things, and he said that he thought Tillman loved him, even when he got on her bad side and even when she made him do homework, and that he felt safe at Tillman's house. He agreed that being at Tillman's was a good place for him, that Tillman was helping him prepare for his future, and that he had not been getting that help before living with her. J.P. indicated that if the trial court said he could stay with Tillman forever, that would make him happy.

When Father's attorney asked him whether he understood that being adopted meant that Father's rights to him would have to be terminated, J.P. replied, "Yes, sir." He also said, "Yes, sir," when asked whether he understood that it meant he would not be able to see Father anymore. When Father's attorney asked him whether that was what he wanted, J.P. said that he did not

14

know. And when Father's attorney asked him if he wanted a way to live with Tillman but still be able to see Father, J.P. said, "Yes, sir."

J.P.'s affect throughout the entire deposition was somber and subdued, and it did not change much except when he talked about sports, his good grades,[10] his videogames, his art class drawings, and the family dog or when he explained how his little sister Tamara could be a "tattletale pain," even though he still loved her.

Durham contrasted J.P.'s ability to successfully communicate and testify with the fact that during her involvement in his CPS case, he would not talk with anyone or even look anyone in the eye. Durham said that J.P. had progressed from the beginning of the case, to his benefit, and said that if she had been asked about his ability to become a functional member of society five years before, her answer would have been different because of the direction he had appeared to be heading at the time.

Johnson described the changes she saw in J.P. after November 2010, stating,

> He was really positive about having older boys as siblings. He liked the neighborhood where he lived. He liked having the freedom of going outside, shooting baskets, throwing the ball. He got to participate in sports at school, and that was something that if his behaviors didn't warrant it, he wouldn't get to play.

---

[10]Johnson testified that she had not been called to any meetings at J.P.'s school in the last six or seven months before the second trial, and she said that J.P. had told her that he was not having any problems at school.

15

Johnson also stated that although when J.P. was first placed with Tillman, his grades were marginal, during the last school year, his grades had been all As and Bs, which she could not have imagined three years before. Johnson said that J.P. had developed patience with the two little girls who lived there and that he and the two other boys act like siblings.

In 2012, Durham saw J.P. at his sisters' adoptions because she had become their adoption worker. J.P., who was there because Tillman was adopting Tamara, gave Durham a hug when she saw him. Durham stated that all of S.M.'s other children had been adopted.

### 2. Father

In his July 21, 2008 substance abuse assessment, Father stated that S.M. had not been able to properly care for J.P., and he acknowledged that J.P. had not been going to school when J.P. lived with S.M. Father said that the last time he, J.P., and S.M. had lived together had been around 2004. Father also stated that he had no contact with his two older sons but that child support was taken out of his paychecks. Father said that his family history was no one's business.

Father also said that he was a social drinker and that he had started smoking marijuana on a regular basis when he was eighteen but that at the time of the assessment, he did so "infrequently." He had also started using cocaine at around eighteen and had smoked it two weeks before the assessment. The intake worker recommended that Father have individual therapy on an ongoing basis, as well as random urinalysis drug tests to ensure that he remained drug-

16

free, and indicated that Father needed to be held responsible for his behavior "to the utmost degree." Johnson stated that during the November 2010 trial, Father admitted to having used cocaine within the last month before trial, crack cocaine a couple of weeks before the trial, and marijuana a week before the trial and said he would take "[a]nything [he] like[d] to get down [him]."

Durham said that although Father's service plan required him to take urinalysis exams, he specifically refused, telling her that he would test positive. Durham testified that Father told her most of the time that he would test positive for marijuana but that sometimes he would not tell her what he would test positive for. Johnson stated that when Father took drug tests from her, they were not always negative, even though she had discussed with him the necessity of remaining drug-free. Father would sometimes refuse to take drug tests and sometimes he told Johnson that there was no need to test him because the results would be positive. Johnson said that Father had always admitted to her that he continued to use drugs and that he told her that using cocaine would not have any effect on raising a child and had never affected him in raising his other, older children.

In Father's 2008 psychological evaluation, he stated that he lived alone and had been in special education in school. His test results showed evidence of a reading disorder and relatively problematic emotional functioning, with significant suspiciousness and distorted perception. The evaluator concluded that

17

[i]t seems that this patient has a number of risk factors which may make his parenting a child in a safe manner unlikely. If he has maximal support and a spouse or significant other who is strongly committed to children, then this might be overcome, but if the patient is living alone as he is now, it is unlikely he will be able to care for a child effectively.

Because Father was almost completely illiterate, Durham and Johnson both went over his family service plan verbally.

Johnson said that Father had testified in the previous trial that S.M. had stabbed him with a knife and would hit, kick, or push him at least once or twice a month, that she had pushed something through the window and broke it, and that she had hit Father over the head with a vase.[11] Johnson said that Father then said, "[W]omen are like that and that that wasn't that bad." Johnson agreed that Father also said that when S.M. had hit him with the vase, that he thought that was his fault "because he had his other baby mama in the house at the same time."

Durham and Johnson both interacted with Father during weekly visitations or through his workplace because Father had no permanent home address and

---

[11]Father's police records stated that on September 14, 1999, when S.M., Father, and J.P. still lived together, "Subject was attacked by a member of his household with a kitchen knife and meat fork." Father told the police that he was held at knife point in a bathroom for around thirty minutes until he was able to run from the house and call the police. The police arrested S.M. for aggravated assault (family violence), but the case was later dismissed. S.M. also assaulted Father's live-in girlfriend in 2001, but that case was inactivated "due to the apparent lack of concern displayed by the victim." In 2008, Father told the person collecting his data for his alcohol and drug assessment that he had been arrested twice—once for trespassing, for which he received six months' probation, and once for burglary of a building, which led to a conviction.

did not keep CPS informed of his changes in address. Johnson said that Father testified in November 2010 that he did not tell CPS where he was many times because it was none of their business. During the November 2010 trial, Father had been working fifty hours per week at $8.40 an hour and was receiving overtime at time and a half; when asked why he did not have his own place, Father said that it was because he did not have enough money.

Johnson testified that Father did not appear for voir dire at the first termination trial. After the jury terminated his parental rights in the first trial, Father no longer had to pay child support, and the trial court refused to allow him any further visitation. Johnson had not seen Father since a court-ordered mediation in October 2012 despite her attempts to locate him, including her attempts during the week before trial.[12]

Father had worked for the same employer for around fifteen years. Nunn testified that Father had been injured on the job but had already been released back to work by the time he was terminated in November 2012. Johnson also stated that during the November 2010 trial, Father had testified that he had been having problems with his "Mexican coworkers" and that he had said that he was going to pull out his knife and cut someone, knowing he would end up in jail, so

---

[12]Johnson stated that in the week before trial, she had spoken with Nunn, the plant manager at Father's former workplace, "looked on Vinelink to see if he was incarcerated in a county jail," checked the Wichita County jail list, tried old phone numbers of Father's relatives in Sherman, and contacted the Sherman County jail. Johnson also said that she had attempted to contact Father's middle son, C.P., through his Facebook account but that C.P. did not respond.

19

that they would not "mess with [him] no more." She also said that Father had testified that he would get so angry that he could not focus and that he told someone that the only reason he was in the situation with CPS was "some white woman wants my kid."[13] Father told Nunn that he was going to Sherman, Texas, and in late December, Father called Nunn and gave him an address for sending his W-2 form.

### 3. Tillman

Four other children—Matt, Darren, Barbara, and Tamara—all of whom Tillman had adopted, lived with J.P. at Tillman's house. Tamara is J.P.'s eight-year-old sister, and J.P. testified that they were close. Two more of J.P.'s sisters had been adopted by someone who lived in the same town, and he liked being able to see them frequently.

CPS reported in its August 2012 placement review report that J.P. had made a great adjustment to his foster home with Tillman since moving there on January 2, 2012, and had bonded with the other boys in the family, who were close to his age. J.P. was described as "very respectful in his foster home where he has consistent discipline, expectations, and love," had bonded with Tillman and her extended family, and had become the family dog's "favorite person."

---

[13] J.P.'s first foster family had been interested in adopting J.P. but then withdrew. Tillman is African-American, and three of the four adopted children living in her home are African-American.

Johnson said that when J.P. was initially placed with Tillman, he had a few meltdowns at school but that Tillman would not give up on him. Tillman stayed in touch with both Johnson and the school, and "everybody tried to remain on the same page and executed the same type of response to [J.P.'s] behaviors." Johnson said that this was a consistency that she had not seen before.

### 4. Father's Relationship with J.P.

Johnson agreed that J.P. and Father loved each other and were bonded, and she said that she was not surprised that J.P. still loved Father and wanted to see him. Durham stated that Father consistently paid child support and that he was fairly consistent in his visits with J.P., which she said were basically appropriate when she had the case. However, Johnson said that Father was not always consistent in his dealings with J.P. and that she had seen Father say things to J.P. that were inappropriate, hurt J.P.'s feelings, or caused other problems.

Johnson gave the following testimony about how Father, during the November 2010 trial, addressed J.P.'s mental health issue with regard to suicide:

> Q. Now, you testified in November and [Father] testified he didn't know that that was why the Department thought [J.P.] was suicidal, right?
>
> A. He did, yes.
>
> Q. Were you present and do you recall [Father], when I questioned him about what would he tell his son, that he responded[,] ["]I would tell him, [']You [k]now, everybody's gonna die, [J.P.] You gonna die; I'm gonna die. Ain't no need to kill yourself. God don't want you to do that.[']"

21

A. Yes.

Q. Do you recall him specifically, upon my questioning, saying he believed that was an appropriate thing to tell a nine-year-old whose friend had died and that was suicidal?

A. Yes.

Johnson had informed Father that J.P. was on medication for his depression and other issues. At the November 2010 trial, Father admitted that he told J.P. that he did not need to take any medicine because some white doctor gave it to him and said that it was perfectly okay to tell a ten year old that he did not need to do what the doctor said because the doctor was white and J.P. was black.[14] Johnson recalled that during the November 2010 trial, Father specifically said, "[J.P.] do not have any problems" and that J.P. was normal, even after Johnson had explained to him the issues that J.P. was having.

Johnson said that at another visit,

I saw him—[J.P.] had brought some pumpkin bread from his foster home to a visit, and he gave it to his dad and said, ["]My foster mom brought this for us." And [J.P.], during the visit, was eating it. And when [Father] noticed that J.P. had eaten about half of the loaf, he got really mad and started berating him for being a pig. And he said, ["]You're just stuffing your face like some big old woman eating all that.["] He was very angry with [J.P.] for eating the pumpkin bread.

---

[14]In our 2012 opinion, we also noted that Father told J.P. that he was only given the medication because he is black. 2012 WL 579481, at *7.

22

Johnson was present at the November 2010 trial when Father admitted that he had told J.P. he was fat.[15] And during one of the visits, J.P. showed Father that he had been paid $20 for mowing a lawn and had $18 that he had saved from his allowance, and Father asked J.P. for some money so that he could buy Theraflu. J.P. gave Father the money. Johnson testified that this was inappropriate.

Johnson changed the visitation schedule so that Father's visits would be after J.P.'s visits with S.M., to give Father time to get there and so that J.P. would come to the visits, since J.P. was reticent about seeing S.M. Johnson explained to Father that he needed to let CPS know if he would attend the visits because J.P. would get upset if Father failed to appear. In his 2008 substance abuse assessment, Father said that he and J.P. had visitations when Father wanted to have them.[16] Father did not go to see J.P. play football because he decided that he could not control himself so he would not go "if they look at him wrong."

Johnson recalled that in the November 2010 trial, Father had testified that J.P. was removed because S.M. had messed up but that he said that J.P. was still in CPS care because Father had not gotten his act together. She agreed that on several occasions, Father had said that he did not have his life together

---

[15]We noted in our 2012 opinion that when Father admitted that he had told J.P. that he was getting fat, Father said, "That's the way black people is, man. We don't live and think the way y'all do." 2012 WL 579481, at *6.

[16]On one occasion, Father told J.P. that if he did not have his hair cut by the next time he came for a visit, he would leave and would not come to see him again until J.P. got his hair cut.

and could not take care of J.P. At the November 2010 trial, after J.P. had already been in foster care for four years, Father stated that he did not know when he was going to get his act together, that J.P. deserved more, and that he was messed up and could not bring J.P. down to his level.[17] Johnson said she had no idea what Father was doing now, but that there was no reason to believe that he had gotten his act together since November 2010.

### 5. DFPS's Plans for J.P.

Johnson testified that DFPS's plan for J.P. was for him to stay with Tillman and that Tillman had expressed an interest in adopting him. Johnson said that J.P. was more adoptable than he had been in July and November 2010 and that if something happened and Tillman could not adopt him,

> [J.P.]'s built up a level of trust with people, and he's going in a positive direction. He's able to cope better with life and with frustrations. He's able to stop himself from melting down and going into a tail spin. He's making good grades at school. He's playing sports. He's—there's a level of innocence about him. He's not a street-wise kid. He's a good kid. I know that people would appreciate that kind of a kid.

Johnson agreed that it is endangering to a child when a parent consistently uses drugs because "they're not in a position where they could handle an emergency that might arise. They're impaired. They can't make good decisions. They're under the influence of something, and they're certainly not providing a good role

---

[17]We noted in our 2012 opinion that Father had said that J.P. deserved more but that keeping his relationship with J.P. was "everything" to him. 2012 WL 579481, at *7. However, we have no more recent testimony from Father because he did not appear at the 2013 termination trial.

24

model." Further, Johnson explained that a stable home was important because "children need that to grow and feel safe and secure and have trust."

Johnson explained that it was not possible for Tillman to adopt J.P. without Father's rights being terminated. She also testified that J.P. had more emotional needs than most children, stating that he would continue to need counseling and management of his medications, as well as a lot of encouragement and stability. She agreed that instability would present an emotional danger to J.P. The following dialogue then ensued:

> Q. Based upon what you saw and what you heard in November 2010, dealing with family violence in the past and drug use and now unemployment, and, frankly, some of [Father's] theories regarding race relations and what is appropriate to tell your child, does [Father] demonstrate good parental abilities?
>
> A. No.
>
> Q. The fact that [Father] repeatedly said [J.P.] has remained in care at that time for, you know, almost four or five years because he couldn't—because [Father] couldn't get his act together, does that indicate bad parental abilities in your opinion?
>
> A. Yes.
>
> Q. At this point, has Coach [Tillman], in the role of a parent, demonstrated good parental abilities?
>
> A. Yes.
>
> Q. You heard what [J.P.] testified, that he has to do his homework; he has chores; he has to go to school, all of that. Does that indicate good parental abilities?
>
> A. Yes.

Q. The programs available to [Father], is it possible for you to get programs for [Father] when you don't know where he is?

A. No.

Q. Okay. On—in November 2010, which was the last time [Father] appeared in this courtroom during that trial, would you agree with me that his plan was the [DFPS] just keep his kid and he keep visiting?

A. That's correct.

Q. Because he didn't have his act together?

A. That's correct.

Q. Is that a good plan?

A. No.

Q. Why not?

A. That's not stability. That's not consistency for a child. [J.P.], he needs—he needs to be loved and know that he's loved and know that he's gonna be taken care of and gonna be in the same place every day, and that all the expectations of him are gonna be the same.

Q. Do you believe it's ever a good plan for a child to remain in foster care from the age of six or seven until 18?

A. No.

Q. Right now, is the plan that [J.P.] be adopted?

A. Yes.

Johnson stated that Father's only stability, other than his consistent drug use, had been his job, which he had lost, and that Father's illiteracy did not excuse almost seven years of J.P. being in foster care. Johnson stated that Father still

26

had no plan for J.P. and that CPS did not know where Father was or where he was living. She opined that it was in J.P.'s best interest to have Father's parental rights to him terminated and for J.P. to be adopted.

Johnson said that the only thing she had discussed with J.P. was that he wanted to stay with Tillman because J.P. "can't cope with talking about his father, thinking about his father. It—it produces an emotional response in him that you—I worry that he might melt down; he might shut down, that he might regress."

During cross-examination, Johnson agreed that the death of J.P.'s friend had caused a horrible regression and admitted that she could not tell the court that if another tragedy befell J.P., he would not have the same reaction. Johnson agreed that it was possible that J.P. could remain with Tillman even if the trial court did not terminate Father's parental rights to him. Johnson agreed that even though Tillman wanted to adopt J.P., Johnson could not guarantee that it would happen and that, generally, older children with serious mental issues were less adoptable. Johnson also said that she did not think terminating Father's parental rights to J.P. would present an emotional danger.

J.P.'s attorney ad litem asked Johnson, "[A]t some point there w[ere] questions of whether or not [J.P.] was salvageable, so to speak, correct?" Johnson replied, "It was pretty tough, yes," and agreed that there had been questions about whether J.P. would spend the rest of his life in and out of residential treatment centers, and, if his behavior continued, in and out of juvenile

27

detention and then potentially jails and prison. Johnson agreed that she no longer had that concern, crediting Tillman.

Johnson stated that she did not think J.P. understood the significance of wanting to be able to see Father and also to remain with Tillman forever and that she did not think J.P. could make a rational and informed decision about that, explaining:

> [J.P.] is a kid, and I believe that every kid wants to have a parent that they can hero worship. And he wants to have that. But I know that [J.P.] would decompensate if he was exposed on a continual basis to his dad. And the reason why I know that is because after that testimony [J.P.'s video deposition], he did have some problems later on in the day.

Johnson explained that J.P.'s problems after the video deposition were not to the degree he would have experienced several years ago and that he had worked through it. Johnson agreed that J.P.'s progress in being able to deal with his emotional issues was a result of Father's absence from his life and that J.P. regresses when Father is involved. When asked whether she thought Father would ever make decisions that were in J.P.'s best interest or stop using drugs, Johnson said, "Not based on his history." When asked whether, based on J.P.'s history with Tillman, she believed that Tillman would take appropriate action and act in J.P.'s best interest, Johnson said, "Yes," and that based on Tillman's

28

having adopted the other children in her home—including J.P.'s younger sister Tamara—history indicated that she would adopt J.P.[18]

The last time J.P. saw Father was at the beginning of 2011. During the two years without seeing Father, J.P. had graduated from the residential treatment center, learned to trust people, and stopped having meltdowns, and his grades went up.

## C. Applicable Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). The following factors, among others, should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment: the child's age and physical and mental vulnerabilities; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of

---

[18]We noted in 2012 that at the time of the first termination trial, J.P. was still in the residential treatment center. 2012 WL 579481, at *8. Because J.P. was not in an adoptive placement at the time of that trial, CPS did not present any evidence as to the stability of its proposed placement. *Id.*

time; whether an adequate social support system consisting of extended family and friends is available to the child; and whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with guidance and supervision consistent with the child's safety and a safe physical home environment. *Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A) the desires of the child;

(B) the emotional and physical needs of the child now and in the future;

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individuals seeking custody;

(E) the programs available to assist these individuals to promote the best interest of the child;

(F) the plans for the child by these individuals or by the agency seeking custody;

(G) the stability of the home or proposed placement;

(H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of

30

just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

Here, Father contends, "There can be no doubt that the three of the first six [*Holley*] factors weigh heavily in [his] favor or are at least neutral." But while, as Father argues, J.P. may indeed "crave[] a continued relationship with his father," J.P. also testified that he wanted Tillman to adopt him as she had adopted his younger sister Tamara and said that he understood that this meant Father's rights to him would have to be terminated. The following dialogue between J.P. and Father's attorney demonstrates J.P.'s ambivalent emotional state as to the issue:

> Q. And that would mean you couldn't visit with [Father] anymore. He wouldn't be able to see you anymore.
>
> A. Yes, sir.
>
> Q. Is that what you want?
>
> A. I don't know.

*Cf. In re W.S.M.*, 107 S.W.3d 772, 773 (Tex. App.—Texarkana 2003, no pet.) (stating that while a child's love for his natural parents is a very important best interest consideration, "it cannot override or outweigh the overwhelming and undisputed evidence" of endangerment or "compensate for the lack of an opportunity to grow up in a normal and safe way equipped to live a normal,

productive, and satisfying life"). Further, while Father argues that the evidence regarding J.P.'s mental and emotional issues and his relationship with Father mandate that the factors pertaining to the child's emotional and physical needs and the danger to him now and in the future weigh in his favor as well, the record reflects that J.P. has done well both emotionally and academically without Father's presence or involvement.

As we concluded in our 2012 opinion, and based on the evidence presented in the second termination trial, the following could have convinced the trial court that termination of Father's parental rights was in J.P.'s best interest: Father's drug use, Father's inability to provide a stable home (for J.P. or for himself), Father's failure to acknowledge J.P.'s mental health issues, and Father not seeing a problem if J.P. was exposed to domestic violence or unsafe living conditions. *See* 2012 WL 579481, at *8. Additionally, since the first trial, J.P. had been successfully discharged from the residential treatment center, had made significant progress in managing his mental health problems, and had begun living with Tillman, who provided J.P. and her four adopted children— including J.P.'s younger sister Tamara—with guidance and supervision consistent with the children's safety and a safe home environment. *See* Tex. Fam. Code Ann. § 263.307(b); *Holley*, 544 S.W.2d at 371–72. Therefore, we conclude that the evidence is once more legally sufficient to support the trial court's best interest finding, and we overrule Father's first issue.

Further, our concerns in the preceding appeal about whether J.P. would be able emotionally to handle Father's absence from his life until he turns eighteen have been mitigated by J.P.'s noted interpersonal and academic success in the two years of Father's absence since the first termination trial. Furthermore, despite Father's claim in the first trial that J.P. was "everything" to him, *see* 2012 WL 579481, at *8, Father left CPS no forwarding address after he lost his job, and he failed to appear at the second trial despite his attorney's acknowledging that he knew about it. Although J.P. testified that he still wanted Father in his life, J.P. was also clear in stating that he wanted to stay with Tillman and to be adopted by her as his younger sister Tamara had been. The trial court also heard evidence that bringing Father back into J.P.'s life might be detrimental to all of J.P.'s progress and heard no evidence that Father's lifestyle had stabilized or improved in the intervening years. And although Father argues that J.P.'s emotional health "could be at risk if th[eir] relationship is severed," the record reflects that J.P. survived the termination of Father's parental rights after the first trial, and even though he suffered some emotional trauma, he still managed to progress both emotionally and academically after working through that trauma. *Cf. In re C.P.*, No. 07-12-00545-CV, 2013 WL 2107176, at *3–4 (Tex. App.— Amarillo May 10, 2013, no pet.) (mem. op.).[19] Based on all of the foregoing and

---

[19]In *C.P.*, the Amarillo court of appeals addressed the termination of a mother's parental rights to her three children, all of whom required medication and therapy for their severe behavioral problems, and one of whom required placement in a residential treatment facility because of his volatile behavior.

our review of the entire record, we conclude that the evidence is also factually sufficient to support the trial court's best interest finding, and we overrule Father's second issue.  *See H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573.

## IV.  Conclusion

Having overruled both of Father's issues, we affirm the trial court's judgment.

PER CURIAM

PANEL:  MCCOY, GARDNER, and WALKER, JJ.

DELIVERED:  July 18, 2013

---

2013 WL 2107176, at *3–4.  Even though one of the three children indicated a desire to return to their mother, and even though the mother demonstrated improved stability, the court concluded that evidence supporting the best interest finding in favor of termination was factually sufficient.  *Id.*  The court reasoned, "The evidence permitted the court to reach a firm conclusion that K.A.P. . . . was unlikely to be able to provide the kind of care these children require.  And, *so long as their conservatorship remained undecided, the resulting uncertainty and instability hindered their progress toward emotional well-being*."  *Id.* at *4 (emphasis added); *see also In re M.C.T.*, 250 S.W.3d 161, 165, 171 (Tex. App.—Fort Worth 2008, no pet.) (noting that termination of parent's rights was in best interest of child who had been admitted twice to an inpatient psychiatry unit and was in a residential treatment center during trial when child was emotionally disturbed and educationally undeveloped and required intense supervision, despite child's testimony that he wanted to return to parent's home).